# N. D. Jones, Appellant, *v.* The Forest Oil Company.

*Mines and mining—Use of gas pump in oil well—Injunction—Equity.*

An injunction will not be granted to restrain the use of a gas pump in an oil well, where it appears that gas pumps have been in constant use in all oil fields except one, to a greater or less extent, since the discovery of oil; that they are only used in wells in territory almost exhausted; that their cost is within the reach of all operators, and, when used by all, none is injured.

Argued Nov. 2, 1899. Appeal, No. 188, Oct. T., 1899, by plaintiff, from decree of C. P. No. 2, Allegheny Co., July T.,

1899, No. 256, dismissing bill in equity. Before GREEN, Mc-COLLUM, MITCHELL, FELL and BROWN, JJ. Affirmed.

Bill in equity for an injunction to restrain the defendant from using a gas pump in an oil well.

The facts appear by the opinion of FRAZER, J., which was as follows:

### · FINDINGS OF FACT.

From the bill, answer and testimony taken at the trial, we find the following facts :

1. The plaintiff is the owner in fee simple of a tract of land situate in Robinson township, this county, generally known as the W. H. Kelso farm, bounded by lands of Tidball, Boyce heirs, Neely, Schaffer, Linton, Noble heirs and McCurdy, and containing about 126 acres. The plaintiff has drilled six oil wells on said farm, two of these wells, known as Kelso Nos. 2 and 3, being located 251 to 204 feet, respectively, from the south line of the farm. Well No. 2 was finished and began producing oil in October, 1891; No. 3 was finished and began producing in November, 1891.

2. The Forest Oil Company is a corporation of this commonwealth, and as lessee has the exclusive right to drill for oil and gas on the farm of the Boyce heirs, which farm adjoins the Kelso farm of plaintiff on the south. On this farm the defendant has completed and is now operating several oil wells, among them a well known as No. 1 Boyce, which is located 162 feet from the line dividing the Kelso and Boyce farms, and is 366 feet south from Kelso No. 3, and 560 feet southwest from Kelso No. 2; the well known as Boyce No. 3 is located 200 feet south from the line dividing the Kelso and Boyce farms.

3. The parties hereto have each leased numerous other farms adjoining the Boyce and Kelso farms for oil and gas purposes, and are now, and have been for some time, producing oil and gas therefrom; that the oil is now obtained from all wells in that field by pumping, the daily production of the wells being small. I further find that the sand or rock from which oil is obtained in this field is of a loose, course, gravelly nature.

4. Boyce well No. 1, in the early fall of 1898, was producing from twelve to fifteen barrels of oil per day, and this production

gradually fell off until December 1, 1898, when its output was seven and one half barrels, and in January, 1899, it was producing less than one per day; in February, 1899, the well was "shot" and cleaned out, and shortly thereafter there was added to its pumping machinery and apparatus a device known as a gas pump. This device is used by oil operators for the purpose of withdrawing gas from the wells by suction, thereby increasing the wells' production of oil. The distance from which these pumps will draw oil and gas depends upon the nature and quality of the oil-producing sand, its effect being felt to a much greater distance in a coarse and loose sand than in a hard and compact sand. About one week after the use of the gas pump was commenced on the Boyce No. 1, the gas supply in Kelso wells Nos. 2 and 3 of plaintiff began to fall off, and shortly afterwards the oil production of these wells was decreased. After the use of the gas pump on Boyce No. 1 was discontinued, Kelso No. 2 went back to its former production, and No. 3 is now producing daily as much as formerly within fifty-five one hundredths of a barrel, and both wells now have an ample supply of gas.

5. The production of the three wells claimed to be affected by the use of the gas pump was as follows: Kelso No. 2, before use of gas pump on Boyce No. 1, five barrels in six days; Kelso No. 2, while using gas pump on Boyce No. 1, four and one fourth barrels in six days; Kelso No. 3, before using gas pump on Boyce No. 1, three and three fourths barrels in six days; Kelso No. 3, while using gas pump on Boyce No. 1, two and one half barrels in six days; Boyce No. 1, before using pump, produced a fraction less than one barrel daily; Boyce No. 2, while using pump, produced a fraction more than one barrel daily.

6. The gas pump has been used in every oil field except that known as the Bradford field, but it is not generally used except in failing and almost exhausted territory. Its use by one operator necessitates its use by others in the immediate neighborhood, if they desire to prevent the daily production of their wells from being decreased. If pumps are placed on all wells the production of the wells is neither increased nor diminished; these pumps can be purchased either in Pittsburg or at various points in the oil fields, and cost from $50.00 upwards, according to size, and the pump used on Boyce No. 1, cost $60.00.

7. Gas pumps were in use in the "McCurdy field," the field in which the plaintiff's and defendant's wells are located, before being placed on the Boyce well No. 1, and have been in use in that field for more than one year previous thereto, and are now being used on wells in that field.

8. The farms of plaintiff and defendant described in findings one and two lie wholly in what is known as the McCurdy oil field, which field was discovered in the year 1890, and has been operated since that time; the production of the wells has largely decreased, and at this time the field is almost exhausted.

## CONCLUSIONS OF LAW.

The question for determination in this case is a new one. Counsel have not referred us to any case in which this question was involved, nor have we in our examination of the case found any. The question here is, to what extent an owner of oil wells may use mechanical devices for bringing the oil to the surface. In operating his own wells, may he use appliances which diminish the production of his neighbor's wells? It is not denied that a gas pump will to some extent affect the production of oil wells located in the immediate neighborhood of the well to which the pump is attached, if the sand from which the oil is obtained is of a porous, pebbly nature, as is the case in the McCurdy field. To some extent the law governing the use of subterranean waters by the owner of the surface is applicable to the production of oil. In regard to wells and springs, the law is well settled that the owner of land is not entitled to recover for injuries to his wells and springs caused by the acts of an adjoining owner, if the injury results from a lawful exercise of the rights of the adjoining owner, on his own property, and without malice or negligence. An owner of land may dig a well upon his property, and if in so doing he taps the hidden flow of water which supplies his neighbor's spring, it is a loss to the neighbor for which the law provides no remedy: Lybe's Appeal, 106 Pa. 626. In Pennsylvania Coal Company v. Sanderson, 113 Pa. 145, it is said : " It must be conceded, we think, that every man is entitled to the ordinary and natural use and enjoyment of his property; he may cut down the forest trees, clear and cultivate his land, although in so doing he may dry up the sources of his neighbor's springs, or remove the

natural barriers against wind and storm. In sinking his well he may intercept and appropriate the water which supplies his neighbor's well."

In this case the defendant has the exclusive right to bore for oil on the farm of the Boyce heirs adjoining a farm owned by plaintiff; the right being a lawful one, the defendant is at liberty to use all lawful means to obtain "all the gas and oil contained in or obtainable through the land" (Westmoreland Natural Gas Co. v. De Witt, 130 Pa. 249), and to that end it may resort to the use of all known lawful modern machinery and appliances. The plaintiff's claim is that the use of a gas pump in the production of oil is unlawful because, as he alleged, by its powerful suction, the oil and gas are drawn from his adjoining farm, thereby decreasing his production. Plaintiff assumes that there is a certain fixed amount of oil and gas under his farm in which he has an absolute property. True they belong to him while they are part of his land, but when they migrate to the lands of his neighbor or become under his control, they belong to the neighbor. On this point, in Brown v. Vandergrift, 80 Pa. 147, Judge AGNEW, in referring to the production of petroleum, says, "Its fugitive and wandering existence within the limits of a particular tract was uncertain," and in Westmoreland Natural Gas Co. v. De Witt, supra, Justice MITCHELL says, "Water and oil, and still more strongly gas, may be classed by themselves, if the analogy be not too fanciful, as minerals feras naturæ. In common with animals, and unlike other minerals, they have the power and the tendency to escape without the volition of the owner. They belong to the owner of the land and are a part of it so long as they are on or in it, and are subject to his control; but when they escape and go into other land, or come under others' control, the title of the former owner is gone. Possession of the land, therefore, is not necessarily possession of the gas. If an adjoining or even a distant owner drills his own land and taps your gas, so that it comes into his well and under his control, it is no longer yours, but his."

From these cases we conclude that the property of the owner of lands in oil and gas is not absolute until it is actually within his grasp and brought to the surface. If possession of the land is not necessarily possession of the oil and gas, is there any reason why an oil and gas operator should not be permitted to

adopt any and all appliances known to the trade to make the production of his wells as large as possible? If one may lawfully use a steam pump, may he not lawfully use a gas pump? In Ballard v. Tomlinson, L. R. 29 Ch. Div. 115, it was held that a landowner has the right to all of the percolating stream under his land, the court saying: "This percolating water below the surface of the earth is therefore a common reservoir or course to which nobody has any property, but of which everybody has the right, so far as he can, of appropriating the whole; the principal of natural use does not apply at all. The plaintiff, if he has a right to use anything in nature, has a right to exercise that user by all the skill and invention of which a man is capable, and it seems to me that as long as the plaintiff uses only lawful means as against his neighbor, however injurious or however artificial those means may be, his right to appropriate the common source is not diminished because he uses the most artificial or most injurious methods."

If it is lawful to take water from a substrata by the "exercise of all the skill and invention of which man is capable" we see no reason why it is not lawful to produce oil by those means, especially as the possession of the soil for purposes of tillage gives the owner no actual possession of the oil and gas underlying it. The evidence shows that the gas pump has been in constant use in all fields, except one, to a greater or less extent since the discovery of oil; that its use has been generally recognized by all operators, and that it is only used on wells in territory which is almost exhausted. Gas pumps have been used in this field for almost a year past within 1,500 feet of the wells of both plaintiff and defendant, without objection; their cost is within the reach of all operators, and when used by all none are injured. It seems to me that if it is unlawful to use a gas pump because its use may perhaps lessen the supply of gas in the well of an adjoining owner, and thereby diminish his production of oil, for the same reason it is unlawful to use a steam pump, and if neither gas nor steam can lawfully be used in pumping, very few wells at this day will pay drilling and operating expenses.

In view of the testimony and authorities above cited, we conclude that the use of a gas pump by defendant, under the circumstances of this case, is not an unlawful act that should be

restrained by injunction; that the plaintiff is not entitled to the relief prayed for, and that the bill should be dismissed.

And now, July 29, 1899, the preliminary injunction heretofore granted in this case is dissolved, and the bill dismissed at costs of plaintiff.

*Error assigned* was the decree of the court.

*A. M. Brown*, with him *John D. Brown*, for appellant.—It is no answer in either law or morals to say that defendant has an arbitrary right to use the gas pump, and that other people must suffer loss or total destruction of their property rights, unless they introduce a similar pump to fight the operations of defendant's machinery.

The distinction between rights in surface, and in subterranean, waters, is not founded on the fact of their location above, or below ground, but on the fact of knowledge, actually acquired or reasonably acquirable, of their existence, location and course; in either case the rule of damnum absque injuria applies only in the absence of negligence or malice.

If a person boring for oil or gas have knowledge that neighboring wells are supplied from the stratum of clear water underlying his land, and that there is a deeper stratum of salt water likely to rise and mingle with the fresh, when penetrated with such boring, and may prevent their mingling by reasonable outlay, his failure to use the means available therefor is negligence.

Negligence is the absence of such care and regard for the rights of others as a prudent and just man would and should have in the same situation: Collins v. Chartiers Valley Gas Co., 131 Pa. 143.

*R. W. Cummins* and *J. McF. Carpenter*, for appellee, were not heard, but in their printed brief cited Wheatley v. Baugh, 25 Pa. 528, Lybe's App., 106 Pa. 626, Penna. Coal Co. v. Sanderson, 113 Pa. 145, and Williams v. Ladew, 161 Pa. 283.

PER CURIAM, January 2, 1900:

Though this particular question is somewhat of a novelty the principles which control it are very familiar and perfectly well

settled.   They are well expressed in the opinion of the learned
court below and on the findings of fact and conclusions of law
there contained we affirm the decree.