# Barnard, Appellant, *v.* Monongahela Natural Gas Company.

*Oil and gas lease—Adjoining lands—Exhaustion of gas.*

A landowner has a right to drill an oil or gas well on any part of his land without regard to the effect on the adjoining land.

The only remedy of the adjoining owner is to protect his oil by a well on his own land.

A lessee has the same rights in this respect as his lessor. But where the same lessee holds under two adjoining lessors he may not fraudulently or evasively so drill his wells as to drain the property of one to the detriment of the other.

Such lessee may, however, drill a well on one farm close to the line of the other and draw from the latter three-fourths of the gas therein, if it appears that he also drilled a well on the latter and in good faith endeavored to develop the land in the performance of his duty.


Argued Oct. 18, 1906. Appeal, No. 124, Oct. T., 1906, by plaintiffs, from decree of C. P. Washington Co., No. 1,520, in equity, dismissing bill in equity in case of Daniel Barnard and Elizabeth Barnard v. The Monongahela Natural Gas Company. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Bill in equity for an injunction and an accounting.

MCILVAINE, P. J., filed the following opinion :

The court finds the facts in this case to be as follows :

1. Daniel Barnard and Elizabeth Barnard, the plaintiffs in this case, are the owners in fee of a tract of land in Deemston borough, in this county, containing sixty-six acres, more or less.

2. James B. Barnard owns in fee a tract of land adjoining the plaintiffs' land and containing 156 acres.

3. The Monongahela Natural Gas Company, a corporation in the business of producing and marketing natural gas, holds a lease on each of these farms "for the purpose and with the exclusive right of drilling and operating thereon for petroleum and gas," which said leases were in full force and effect when the bill herein was filed and are yet in force and effect.] By the terms of these leases the Monongahela Natural Gas Com-

pany is to pay to the respective lessors a fixed sum per year for the gas from each well drilled on their or his farm "so long as it shall be sold therefrom."

4. The farm of James B. Barnard joins the farm of the plaintiffs, Daniel and Elizabeth Barnard, in such a way that at one corner of his farm there is an angle of about twelve degrees less than a right angle, and the lines of the adjoining farm that make this angle are respectively sixty-two and seventy-five rods long, so that a circle large enough to include ten acres of ground with its center at this corner would inclose less than two and one-half acres of the land of James B. Barnard and seven and one-half acres of the land of Daniel and Elizabeth Barnard.

5. That the Monongahela Natural Gas Company, the defendant, lately drilled a well on the James B. Barnard farm in the corner described in our previous finding which is fifty-five feet from the actual corner, and about thirty-five feet from either of the lines dividing the two farms, and upon the completion of said well it was found to be a paying gas well such as to entitle the lessor to his annual rental, provided for in the lease. This well was drilled on the location chosen after the plaintiffs had protested against it being located so near their lines.

6. That since this well was drilled on the James B. Barnard farm the defendant company has drilled a well on the plaintiffs' farm 1,350 feet away from the James B. Barnard well and not far from an angle which the line of the plaintiffs' farm and their adjoiners make. This well when completed failed to produce any gas.

7. A gas well in time will drain ten acres, more or less, of land and if the gas producing sand is equally porous the gas will be drawn along all the radii of a circle of which the well is the center.

8. The Monongahela Natural Gas Company, the defendant, when it located its well on the corner of the James B. Barnard farm did not do so with intent to fraudulently deprive the plaintiffs of their rights.

CONCLUSIONS OF LAW.

1. That the drilling of the well on the farm of James B. Barnard by the defendant company and taking the gas therefrom in no way invades the plaintiffs' property rights.

2. That the defendant company, under all the facts of this case, is not guilty of either actual or legal fraud in that it drilled the James B. Barnard well where it did and drained gas from the plaintiffs' farm.

## COMMENTS.

The facts in this case are not complicated and are substantially undisputed. But the plaintiffs' contention raises a question of law that is both novel and interesting, and if sustained by the highest court of our state would revolutionize the manner of developing oil and gas leaseholds. "What the law ought to be" and "what the law is" are different questions. The Supreme Court, ignoring the principle of stare decisis, on account of changed conditions or for any reason justifying it, may declare "what ought to be the law" to be henceforth "the law," but the lower courts have no such authority; our duty is to follow the lead of the decisions, not to qualify, explain, modify, overrule or reverse them.

What then are the questions of law involved in this case, and under existing decisions how must they be answered?

The first question stated broadly is this: "Can a landowner in gas territory, drill a well on his farm close to the line of his adjoining landowner and draw from the land of the latter three-fourths of the gas that his well may produce without so invading the property rights of the adjoining landowner as to be legally accountable therefor." There is no doubt that the oil and gas confined in the oil and gas-bearing sands of a farm belong to the one who holds title to the farm, but it is also recognized both as a question of fact and law that oil and gas are fugitive in their nature and will by reason of inherent pressure seek any opening from the earth's surface that may reach the sand where they are confined. Mr. Justice WILLIAMS, in Wettengel v. Gormley, 160 Pa. 559, in discussing this question so far as it relates to oil, says: "It is well understood among oil operators that the fluid is deposited in a porous sand rock, at a distance ranging from 500 to 3,000 feet below the surface. This rock is saturated throughout its extent with oil and when the hard stratum overlying it is pierced by the drill the oil and gas find vent and are forced by the pressure to which they are subject into and through the well to the sur-

face." "An oil or gas well may draw its product from an indefinite distance and in time exhaust a large space. Exact knowledge on this subject is not at present attainable, but the vagrant character of the mineral and the porous sand rock in which it is found and through which it moves, fully justify the general conclusion we have stated above and have led to its general adoption by practical operators." \

"The right of every landowner to drill a well on his own land at whatever spot he may see fit" certainly must be conceded. If then the landowner drills on his own land at such a spot as best subserves his purposes what is the standing of the adjoining landowner whose oil or gas may be drained by this well? He certainly ought not to be allowed to stop his neighbor from developing his own farm. There is no certain way of ascertaining how much of the oil and gas that comes out of the well was when in situ under this farm and how much under that. What then has been held to be the law?—it is this, as we understand it, every landowner or his lessee may locate his wells wherever he pleases regardless of the interests of others. He may distribute them over the whole farm or locate them only on one part of it. He may crowd the adjoining farms so as to enable him to draw the oil and gas from them. What, then can the neighbor do? Nothing, only go and do likewise. He must protect his own oil and gas. He knows it is wild and will run away if it finds an opening and it is his business to keep it at home. This may not be the best rule, but neither the legislature nor our highest court has given us any better. No doubt many thousands of dollars have been expended "in protecting lines" in oil and gas territory that would not have been expended if some rule had existed by which it could have been avoided. Injunction certainly is not the remedy. If so, just how far must the landowner be from the line of his neighbor to avoid the blow of "this strong arm of the law"?

This brings us to the second question in the case, and that is this, "Will a lessee who has a lease on each of two adjoining farms be enjoined at the instance of one of the landowners from drilling a well on the farm of the other at such a point as will drain most of the gas that it produces from the land of the first?"

This question has in it an element that is not in the other

and that grows out of the fact the landowners have a common lessee. We think it is well settled that the lessee has the same rights in regard to the locating of his wells as the landowner would have if doing the operating, but he cannot take advantage of the fact that he has leases on adjoining farms so as to fraudulently deprive either of his lessors of his royalty or annual gas rental. The law of this position is found in Kleppner v. Lemon, 176 Pa. 502, as explained in the later cases of Colgan v. Forest Oil Co., 194 Pa. 234, and Young v. Forest Oil Co., 194 Pa. 243.

The drilling of the well by the defendant company at the point they did on the James B. Barnard farm was not as we have seen a fraud per se or simply because it would drain gas from the plaintiffs' farm; it might become a fraud because of something other than the drilling of this well, and that would be in refusing to develop or protect the plaintiffs' farm. But it appears that the defendant company soon after they drilled a well in "the angle" of the James B. Barnard farm also located and drilled to completion a well in or near "an angle" of the plaintiffs' farm where he would have gotten some of the gas of his neighbor on the other side of his farm had it been a producing well. The fact that this well proved a dry hole in no way militates against the defendant company's effort to do the fair thing, as between it and the plaintiffs. A well on each farm, and James B. Barnard's farm twice as large as that of the plaintiffs', does not show partiality toward James B. Barnard. We are clearly of the opinion that there was no such fraud on the part of the defendant company in the premises as would entitle the plaintiffs to either an injunction or an accounting for damages done by draining gas from their farm through the James B. Barnard well, and therefore the plaintiffs' bill should be dismissed with costs. . . . .

*Error assigned* was decree dismissing the bill.

*Boyd Crumrine,* with him *E. E. Crumrine,* for appellants.— The owner of a tract of land holding natural gas in it has a property right in the gas protected by the law, and the right to take this gas, for a compensation to the owner, will pass to a lessee of the farm for the purpose of exploring for and obtain-

ing it: Westmoreland, etc., Natural Gas Co. v. DeWitt, 130 Pa. 235; McKnight v. Natural Gas Co., 146 Pa. 185; Wettengel v. Gormley, 160 Pa. 559; s. c., 184 Pa. 354; Kleppner v. Lemon, 176 Pa. 502; s. c., 197 Pa. 430.

The defendant company having exclusive control of the gas in the plaintiffs' farm, so that the plaintiffs could not drill for it and protect themselves, and putting down the well on the adjoining tract in such location that it must drain largely from the plaintiffs' farm, was acting fraudulently as against the plaintiffs, in making use of its opportunities of control of both farms to get the plaintiffs' gas without paying $300 per annum for each producing well put down for it: Plummer v. Coal & Iron Co., 160 Pa. 483; Kleppner v. Lemon, 176 Pa. 502; Colgan v. Oil Co., 194 Pa. 234; Young v. Forest Oil Co., 194 Pa. 243; Adams v. Stage, 18 Pa. Superior Ct. 308.

We submit that the principle of Kleppner v. Lemon, 176 Pa. 502, controls this case.

*R. W. Irwin*, with him *J. A. Wiley* and *A. T. Morgan*, for appellee, cited: Colgan v. Forest Oil Co., 194 Pa. 234; Young v. Forest Oil Co., 194 Pa. 243.

PER CURIAM, January 7, 1907:

Decree affirmed on the opinion of the court below.

---

## Radcliffe *v.* Hollyfield, Appellant.

*Malicious prosecution—Charge—Guilt or innocence of plaintiff.*

On the trial of an action for malicious prosecution, it is reversible error for the court to charge in such a way that the jury may be led to believe that the crucial test of the plaintiff's right to recover was his guilt or innocence; and this is the case although the court may have correctly stated the law in other parts of the charge, and the language complained of was an inadvertence.

*Malicious prosecution—Advice of counsel.*

The advice of counsel operates as a defense in an action for malicious prosecution only when sought in good faith and founded on a complete and accurate statement of all the facts within the knowledge of the prosecutor.

Argued Oct. 18, 1906. Appeal, No. 132, Oct. T., 1906, by defendant, from judgment of C. P. Washington Co., Feb. T.,

1905, No. 256, on verdict for plaintiff in case of Fred Radcliffe v. C. C. Hollyfield and the Singer Sewing Machine Company. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ.    Reversed.

Trespass to recover damages for malicious prosecution.    Before McILVAINE, P. J.

The court charged in part as follows :

[Now, the question arising here is—did Mr. Radcliffe embezzle or fraudulently appropriate any part of these items that have been enumerated to his own use?    Now, gentlemen, the plaintiff sets up one theory and the defendant another.    The plaintiff claims that he had been in the employ of the Singer Manufacturing Company for quite a while.    He has narrated to you the manner in which the business is done, the goods shipped to the local office at Charleroi ; how the company keeps track of the business and how the returns are made by the agent, and he claims that in this settlement where this $98.60 is claimed to be due, that it was a disputed claim.    I believe the plaintiff on the stand, the last day that he was called back, denied that he owed the company anything, said that if there was a proper settlement and he was given credit for all the commissions that were due him, that they still owed him something yet.    Now, his theory is—his contention is that if you would find that that was true—that the manner the business was run there was such that these claims were fairly disputed as to whether he was accountable for them or not, would negative the idea entirely, and conclusively rebut it that he fraudulently appropriated any of this property to his own use.    And that would be true, gentlemen ; a man who occupies a trust relation such as Mr. Radcliffe did there, that is, if the accounts of a man, that was managing property to be sold and to account for the proceeds, get into such shape that there is fairly disputed question between them as to what is due or whether he owes anything at all or not, that raises such a condition of affairs as to rebut the idea that the property in dispute was fraudulently appropriated.    If there was a fair claim that he should retain that property in order to meet the claim that he had against the company, why that would not be a fraudulent

appropriation. It is just the same question exactly as that involved in larceny. If a perfect stranger break into your barn at night and take away a horse and sell it and put the money in his pocket, there cannot be very much doubt about his intent being felonious. But if he happen to be a neighbor of yours and you had bought that horse from him a day or so before and had made misrepresentations and cheated him so that he claimed that the title did not pass to you and he went over to your stable and took it back to his place and sent you word that he rescinded the contract and had taken the horse, why you would not have a very good show to sustain a charge of larceny, because the criminal intent would be negatived by the circumstances that surrounded the taking, although the physical act of taking might be just exactly the same in one case as the other. And the same way in a case where there is a settlement between two parties. If the facts in the case show that the property that is alleged to be still in the hands of the agent is retained by him and he refuses to account for it on what is a fair showing of the case that he does not owe the other party anything, why it would negative the idea that he fraudulently intended to appropriate it.

Now, that is the claim here, as I understand it, of the plaintiff; he claims that the circumstances surrounding the conduct of the business and the liability to mistakes and things of that kind account for these different things here that are named by the company as being in the possession of the plaintiff, and that if there was an honest settlement that he would not owe them anything. If he does not owe them anything, of course he has not fraudulently appropriated anything that was committed to his hands.

Now, gentlemen, as to the parts of the machines—needles, etc., he has accounted for some of these by showing that another party had taken them, and perhaps the same may be said in regard to the collections and these overpaid commissions; so that the contest narrows itself down very largely to the two machines—whether or not he has embezzled the two machines that are missing.

It is admitted here, or at least claimed by the defendant, that it has been sufficiently proven and not seriously contested, that there were two machines placed in the hands of the plaintiff

Radcliffe and for which he receipted, that have not been returned
and that they are missing.  Now, did he fraudulently appro-
priate those machines, either the machines themselves or the
money that they may have been sold for, if they were sold, to
his own use?] [1]

[We have a well-established principle, gentlemen, that where
a man who is a layman, and not supposed to know the law, goes
to one learned in the law, and especially would that be true
where he went to the district attorney who is under oath to
represent fairly and honestly both the commonwealth and the
defendant in criminal prosecutions—where he goes to the dis-
trict attorney and honestly lays all the facts bearing upon the
question before him, and the district attorney tells him that
those facts make out a case of probable cause, for him to go
ahead and make an information; it is a complete protection.
Because that very act of going before a district attorney and
telling him all the facts and following his advice conclusively
negatives the idea of malice, and it always ought to be conclu-
sive on the question of probable cause, at least until the dis-
trict attorney would be in some way shown as being in collusion
with him—and of course there is nothing of that kind here in
this case.  Now, you see that this is another condition of affairs
which may exist in cases of this kind that must also have the
consideration of a jury.  You will notice that I said that where
a man went before the district attorney and gave him all the
facts bearing on the question and the district attorney advised
him and he followed his advice, it is a complete protection.
Now, it very frequently happens that the claim is set up by a
plaintiff in cases of this kind where that defense is injected
that the defendant when acting as the prosecutor had not told
all the facts that he should have told the district attorney;
lawyers all know how frequently they give advice that does
not bring good results and sometimes the client may justly
blame the lawyer, but in nine cases out of ten it is not the law-
yer's fault; it is the client's fault because he told him a great
many things that he could not establish; when he advised him
to proceed in a certain case it was on condition that the client
that was getting the advice was telling the whole truth.  Now,
it is very important here in a case of this kind to know that the
whole truth was told by Mr. Hollyfield to the district attorney

because the district attorney's advice is a perfect protection if he revealed what was substantially the whole truth.    It was not necessary, of course, to take as much time in telling the district attorney as we have in trying the case, but did he honestly in good faith substantially lay all these material facts before the district attorney that are involved in this case ?    If he did and the district attorney advised the prosecution, that is a protection. Now, that is controverted here and it will be for you to say, gentlemen, whether or not Mr. Hollyfield, taking the district attorney's testimony and his own testimony, whether or not he failed to give the plaintiff's theory here of this case to the district attorney when in good faith he ought to have done that.    Now, that is the claim of the plaintiff, that is that if he wanted to be honest about the matter he ought to have given to the district attorney what he knew was the claim of the plaintiff.    As I said before, of course, it would lead again (if that was not done) to the question whether or not the claim of the plaintiff in regard to the lost machines was a reasonable claim to be made in view of the other facts found.

Now, gentlemen, there is something said here by the district attorney that requires me to say a word further.  The district attorney says that at a certain stage in his interview with Mr. Hollyfield he said to him :  " I don't think you need to say anything further about the matter ; what you have said already is enough to show probable cause here and you are justified in making an information on what you have already stated."  Well, now, whether or not that relieved Mr. Hollyfield is also a question for the jury.   In case Mr. Hollyfield had stated what he thought was substantially and what was substantially all the matters involved, why stopping him there by the district attorney and saying that was enough would be a protection.    But if he had only told half his story and it was the incriminating part of his story and there was another part of it back that explained away those incriminating circumstances—it would have been Mr. Hollyfield's duty to have said to the district attorney : " Well, you had better hear the other half of this story because it is a little different—other than that I have told—and it may modify your opinion."    The district attorney had a right to say that because he meant by saying that, that if that is the condition of this case and there is nothing to qualify it there

is probable cause there and go ahead, and if Mr. Hollyfield knew something that would explain away that, then it would be his duty to say to the district attorney, " I have other matters that may modify your opinion," and he should have told him the whole thing, and if he purposely refrained from doing that and allowed the district attorney to be substantially misled in that way by not having the whole story, then it would not be a protection, because that would not be an honest narration of all the facts that he ought in law to lay before the attorney in order to get the advice that would be a protection.] [2]

Verdict and judgment for plaintiff for $3,000.   Defendant appealed.

*Errors assigned* were (1, 2) above instructions, quoting them.

*Norman E. Clark*, with him *W. S. Parker* and *Winfield McIlvaine*, for appellant, cited: Seibert v. Price, 5 W. & S. 438; Smith v. Ege, 52 Pa. 419; Gilliford v. Windel, 108 Pa. 142; Cooper v. Hart, 147 Pa. 594; Fisher v. Forrester, 33 Pa. 501; Sutton v. Anderson, 103 Pa. 151; Bankell v. Weinacht, 99 App. Div. 316 (91 N. Y. Supp. 107); Bruff v. Kendrick, 21 Pa. Superior Ct. 468; Scott v. Dewey, 23 Pa. Superior Ct. 396; Ruffner v. Hooks, 2 Pa. Superior Ct. 278; Mitchell v. Logan, 172 Pa. 349; Laughlin v. Clawson, 27 Pa. 328.

*R. W. Irwin*, of *Irwin, Wiley & Morgan*, for appellee, cited: Smith v. Walter, 125 Pa. 453; Barhight v. Tammany, 158 Pa. 545; Bell v. R. R. Co., 202 Pa. 178; Smith v. Ege, 52 Pa. 419; Bernar v. Dunlap, 94 Pa. 329; MacDonald v. Schroeder, 214 Pa. 411; Mitchell v. Logan, 172 Pa. 349; McCarthy v. DeArmit, 99 Pa. 63; Mahaffey v. Byers, 151 Pa. 92; Leahey v. March, 155 Pa. 458.

OPINION BY MR. JUSTICE FELL, January 7, 1907:

The part of the charge covered by the first assignment of error is open to the objection that it submitted to the jury a question not involved in the issue and made the liability of the defendant depend upon the guilt or innocence of the plain-